# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ADAM A. LOCKE,<br><br>                      Plaintiff,<br><br>v.<br><br>ANTHONY FLORES and MYA HAESSIG,<br><br>                      Defendants. | Case No. 10-CV-430-JPS<br><br><br><br>ORDER |

       The *pro se* plaintiff, Adam A. Locke ("Locke"), filed a claim under 42 U.S.C. § 1983, asserting that defendant Anthony Flores ("Flores"), a former State of Wisconsin Probation and Parole Agent, sexually harassed the plaintiff while he was on extended supervision. Locke also asserts that defendant Mya Haessig ("Haessig"), the Wisconsin Department of Corrections Field Supervisor to whom Flores reported, failed to properly supervise Flores and permitted the harassment to continue after she was notified of the plaintiff's complaints regarding the abuse. Before the court are several motions filed by Locke, including: (1) a motion for an extension of time; (2) a motion to order the United States Marshal's Service to serve several subpoenas; (3) a motion to enter a default judgment against defendant Flores; and (4) a motion to compel discovery. Also before the court is Haessig's motion for summary judgment.

1.     Background[1]

       Haessig has been employed by the Wisconsin Department of Corrections ("DOC") as a Corrections Field Supervisor since March 14, 1999.

---

[1] Facts are taken from the undisputed portions of Defendant Haessig's Proposed Findings of Facts (Docket #74) and from the verified amended complaint (Docket #31-1).

In her capacity as a Corrections Field Supervisor, Haessig's responsibilities include overseeing the operation and administration of a field unit, which includes the supervision and control of offenders; development, implementation, and monitoring of programs and services; and the supervision, direction, and monitoring of all unit staff. She is responsible for overseeing the work of the Probation and Parole Agents under her direct supervision.

Flores was employed by DOC as a Probation/Parole Agent in the Division of Community Corrections from January 3, 2000, until he resigned on June 15, 2010. Haessig supervised Flores from April 23, 2000, until June 15, 2010.

Locke reported to several agents during his tenure as a prisoner and on supervised release. From October 21, 2004, to March 7, 2007, Locke was supervised by Agent Patrick Chapman. From March 7, 2007, to August 5, 2008, Locke was supervised by Agent Wendy Schwartz ("Schwartz"), and from August 5, 2008, to May 8, 2009, he was again supervised by Agent Chapman. Locke was not assigned to Flores, but Flores occasionally filled in for Schwartz. Upon his initial release from Racine Correctional Institution, Locke was placed on the Electronic Monitoring Program ("EMP"). On October 25, 2007, after a period of reincarceration, Locke was released from the Racine County Jail and Flores had the duty of placing him back on the EMP.

Beginning around May 2007, Flores would call Locke into his office and offer to help him in various ways. Over time, Flores turned these conversations into propositions. Beginning around June 2007, Flores began to call Locke at his residence and offer personal invitations to go out to eat, to go out to drink, and to come to his home. Flores also began to proposition

Locke for sexual intercourse and sexual favors inside his office when Locke reported for his weekly supervision visits. After Flores picked Locke up from the Racine County Jail in October 2007, he caressed Locke's leg and began to kiss Locke's foot. Later, Flores promised Locke that if he allowed Flores to take nude photos of him, Flores would cut off his ankle monitor and make sure that he wouldn't have to worry about revocation. Flores continued to make aggressive sexual advances towards Locke throughout 2008, and also threatened him. Eventually, Locke allowed Flores to take clothed pictures of him, which the FBI now has.

At some point during Locke's supervision, between December 2007 and February 2008, while he was in custody at the Racine County Jail, he complained to Schwartz about issues with Flores. After meeting with Locke at the jail, Schwartz stopped into Haessig's office and relayed Locke's verbal allegations about Flores. While Haessig cannot recall whether she spoke directly with Flores about the allegations, she asserts that she called the Regional Office and informed one of the two Regional Chiefs about the complaint. They determined that Schwartz should attempt to obtain a written statement from Locke regarding his complaints about Flores.

In instances such as these, DOC must determine the merits of the allegations. In order to do so, staff follow § DOC 328.11, Wis. Admin. Code, which outlines DOC's established procedure by which clients can obtain administrative review of certain types of decisions via client complaint. Notice of this procedure is also incorporated into the Rules of Community Supervision. The offender signs the Rules of Community Supervision, acknowledging they are aware of the notice. Offenders are directed to make all complaints on the DOC-127 form.

The parties offer divergent recollections of what happened next. According to Haessig, Locke refused to provide Schwartz with a written statement. Thereafter, Locke called Haessig regarding his supervision. During their conversation, Haessig asked Locke if he wanted to talk about the comment he made to Schwartz, and Locke declined, stating he did not want to discuss it further. Haessig then informed the Regional Office that Locke did not wish to file a complaint, and was instructed not to pursue the matter.

In his responsive briefing, Locke asserts, under penalty of perjury, that he never contacted Haessig, and that he has never spoken to Haessig regarding his supervision or any other matter. Locke further asserts, also under penalty of perjury, that Schwartz did not discuss filing a formal complaint with Locke.

Haessig asserts that she did not find out about an ongoing FBI investigation until after July of 2009, when she received a call that two FBI agents were asking questions at the Community Policing House ("COP House"). Haessig states that she contacted Regional Chief Lisa Yeates that day. However, Haessig was not informed of the ongoing investigation until sometime later. While Haessig has never personally been fully informed as to the results of the FBI investigation, it is her recollection that the FBI commenced an investigation of Flores after another offender was investigated for criminal activity and mentioned involvement on the part of Flores. Sometime thereafter, Haessig was notified that this other offender had made allegations that Flores had been sexually inappropriate. On October 19, 2009, Supervisor Peter Marik ("Marik"), the Community Corrections Field Supervisor in Milwaukee who was assigned to investigate the allegations,

contacted Haessig. Marik sent Haessig letters of investigation, which she forwarded to her agents. Marik interviewed the agents and other offenders.

On November 11, 2009, Haessig received a phone call from Agent Carrie Freeman ("Freeman"), who stated that an offender had come to the COP House complaining about Flores. Haessig called the Regional Office and they instructed her to have Freeman complete an incident report; both Freeman and Agent Katie Lemke prepared reports. Haessig forwarded both reports to Regional Chief Lisa Yeates, Assistant Regional Chief Barbara Hanson, and Supervisor Marik.

Marik and Robin Diebold, a Unit Manager at Racine Correctional Institution, started a Prison Rape Elimination Act investigation of Flores. Marik gathered information and completed a preliminary investigation, but Flores resigned prior to the completion of the investigation. Once Marik was involved, Haessig believed that he was handling the entire investigation on DOC's end. The only time Haessig was involved with this investigation was when Marik contacted her via telephone to ask some questions and requested that she serve Flores with an investigation letter. Any information that Haessig received during this time was sent to the Regional Office and/or Marik.

Marik sent Haessig a letter of investigation to give to Flores on May 17, 2010, an amended letter on May 19, 2010, and another letter of investigation on June 9, 2010. Marik held an investigatory interview with Flores on May 27, 2010, and a follow-up interview was scheduled for June 16, 2010. However, Flores' last day of employment following resignation was on June 15, 2010. He had initially submitted his resignation with an effective date of July 9, 2010, but moved it up after learning of the subsequent interview.

Prior to the time that Locke made a comment to Schwartz about alleged sexual advances on the part of Flores, Haessig had not received any complaints about Flores other than normal course of business complaints, such as: I don't like my agent, my agent isn't helping me, my agent keeps locking me up with no justification, etc. Haessig never had any knowledge of Flores telling Locke that he would help him get off the EMP, and Haessig never approved Locke's removal from electronic monitoring. According to the chronological logs, which provide details of an offender's supervision, the only time Locke was off electronic monitoring throughout the course of his supervision was when he was in custody or when the equipment malfunctioned.

2.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

3.  Analysis

To prevail on his claim against Haessig under Section 1983 for failure to supervise, Locke has a burden to show: (1) Flores sexually harassed him; (2) Haessig knew of the harassment; (3) Haessig approved of or purposely ignored Flores' behavior; and (4) Locke was injured. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994).

As to the first element, the parties do not dispute that Flores engaged in misconduct, or that he resigned from his position as a Probation/Parole Agent while under investigation by both the FBI and the DOC. Flores was served with both the original and amended complaints in this case, but failed to file an answer. (Docket # 22 and #46). The parties also agree that sexual harassment by a state employee is an actionable form of sex discrimination in violation of the equal protection clause. *See Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006) ("Victims of sexual harassment by a state employer or employee can seek redress under § 1983. …").

However, the showing that Flores assaulted Locke is not sufficient for Locke to prevail. It is axiomatic that *respondeat superior* liability does not attach to a supervisor for a subordinate's unconstitutional acts. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978). For Haessig to bear any liability for Flores' actions, she must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [she] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). On this point, Haessig offers that she was not personally involved in Flores' sexual harassment of Locke and that she was not deliberately indifferent to Flores' mistreatment of Locke. According to Haessig, upon learning about Locke's allegations of sexual harassment in the beginning of 2008, she directed Schwartz to obtain a written statement from Locke, which he refused to provide. Haessig also submits that Locke failed to make a formal complaint about Flores, and that in a phone conversation Locke told her that he did not want to discuss his allegations further. In response, Locke avers that he never refused to discuss his allegations and that Haessig turned a blind eye to Flores' misconduct and failed to properly supervise him or investigate his

misconduct after Schwartz notified her of Locke's allegations. Defendant Haessig elected not to file a reply brief.

At this stage in the proceedings, the court is constrained to deny Haessig's motion for summary judgment. The parties' dispute over the fundamental facts regarding Haessig's knowledge of, and alleged inattention to, Locke's complaint of harassment render this case unamenable to resolution via summary judgment. The dispute is material, because a jury could find that Haessig never discussed the harassment with Locke, and that, in failing to investigate, Haessig purposefully ignored a complaint of unconstitutional behavior. Having so found, a reasonable jury could render a verdict for Locke. *Anderson*, 477 U.S. at 248; *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("An official satisfies that personal responsibility requirement of § 1983 if she acts or *fails* to act with a deliberate or reckless disregard of the plaintiff's constitutional rights.") (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (emphasis added)). Therefore, Haessig's motion for summary judgment is denied.

4.  Locke's Motions

The court now turns to Locke's several motions. First, Locke filed a motion for an extension of time to file his response to defendant Haessig's motion for summary judgment. In his motion, Locke explains that his response brief was delayed for a few days due to issues with the prison mail room. Haessig filed no opposition to the motion. The court concludes that the extension was reasonable under the circumstances. Accordingly, Locke's motion will be granted. In the foregoing discussion, the court treated Locke's response as timely filed.

The plaintiff also requests entry of a default judgment against defendant Flores. The docket in this case reflects that defendant Flores was

personally served by the U.S. Marshals Service on March 13, 2012 (Executed Summons Return, Docket #46), yet has not filed a responsive pleading to the complaint or otherwise defended this action. Consequently, the clerk entered the default of defendant Flores on the docket on June 15, 2012, pursuant to Fed. R. Civ. P. 55(a). However, default judgment would be premature at this point because the plaintiff has not provided evidence permitting the court to determine the appropriate amount of damages. Such a showing is required for entry of a default judgment pursuant to Fed. R. Civ. P. 55(b)(2). Therefore, the motion for entry of a default judgment will be denied without prejudice. Furthermore, because partial judgments are disfavored, entry of a default judgment against Flores should be deferred until this case is completely resolved.

Finally, Locke has filed several motions related to his desire to subpoena and depose various witnesses. If this case will be tried, the court will undertake to recruit counsel to represent the plaintiff, and will reopen discovery for an appropriate period of time. If this case will be settled, no further discovery will be useful. Therefore, the plaintiff's pending motions related to discovery and subpoenas (Dockets #62, #70, #71) will be denied without prejudice.

Accordingly,

IT IS ORDERED that the plaintiff's motion for default judgment (Docket #85) be and the same is hereby DENIED without prejudice. The clerk has already entered the default of defendant Flores pursuant to Fed. R. Civ. P. 55(a), and no default judgment will be entered pursuant to Fed. R. Civ. P. 55(b)(2) until a basis for the calculation of appropriate damages has been established;

IT IS FURTHER ORDERED that the plaintiff's motions for service of subpoenas (Docket #62 and #71), and to compel discovery (Docket #70) be and the same are hereby DENIED without prejudice; and

IT IS FURTHER ORDERED that defendant Haessig's motion for summary judgment (Docket #72) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge